**NOT YET SCHEDULED FOR ORAL ARRGUMENT**

_____

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 23-5100**
**(C.A. No. 18-3075)**

**LESTER A. LEACH**

**PLAINTIFF-APPELLANT**

**v.**

**JANET YELLEN**

**DEFENDANT-APPELLEE.**

_____

**BRIEF FOR APPELLANT**

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

**ROBERT C. SELDON, ESQ.**
**ANGELA ST. PIERRE, ESQ.**
**SELDON BOFINGER & ASSOCIATES, P.C.**
**1319 F STREET, NW, SUITE 200**
**WASHINGTON, DC 20004**
**(202) 393 – 8200**
**COUNSEL FOR APPELLANT**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The parties who appeared before the district court were plaintiff Lester A. Leach and defendant Janet L. Yellen, in her official capacity as Secretary of the Treasury. There were no intervenors or amici.

The rulings under review are the Memorandum Opinion and accompanying Order of U.S. District Judge James E. Boasberg of March 14, 2023. An Appendix has not yet been prepared. A copy of the District Court's Memorandum Opinion and Order were included with Appellant's initial filings in this appeal, Document 2002143.

There are no related cases.

Respectfully submitted,

*//s//* Robert C. Seldon, Esq.
  D.C. Bar No. 245100
Seldon Bofinger & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C. 20004
(202) 393-8200

Counsel for Appellant

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ……………………………………………iv

**GLOSSARY OF ABBREVIATIONS**……………………….………...viii

**JURISDICTIONAL STATEMENT**……………………………………..ix

**STATEMENT OF ISSUES**……………………………….…………....x

**STATUTORY ADDENDUM**………………………………………xii

**STATEMENT OF THE CASE**........................................................................1

    Background.................................................................................................1

    Leach's Original Protected EEO Activity...............................................4

    The Medina Email....................................................................................5

    Bailey and O'Connor Knew Medina's Allegations Were False...........6

    Concealment Of How The Mint Came To Refer Leach To OIG..........7

    Concurrent Discrimination And Retaliation Against A Protection Chief...........9

    Motl's Antagonism Toward EEO Complainants...............................11

    Gentry's Retaliatory Referral Of AB To OIG.....................................12

    Leach's EEO Complaint Over Being Referred For Investigation.......12

    Interference With OIG Objectivity.......................................................13

    OIG's Report........................................................................................15

    Bailey's Proposal To Suspend Leach..................................................15

    O'Connor's Decision to Suspend Leach..............................................17

    Leach's EEO Record............................................................................18

    Leach's Reassignment and Involuntary Detail....................................19

    Significant Duties Are Removed From Leach's Director Position......20

    Leach's Permanent Removal And Involuntary Reassignment............20

    Procedural History...............................................................................21

**SUMMARY OF ARGUMENT**.....................................................................21

**STANDARD OF REVIEW**.........................................................................25

**ARGUMENT.**...............................................................................................26

    I.    Retaliatory Changes In Terms And Conditions Of Employment Are Per Se Actionable................................................................................26

        A. *Chambers'* Applies To Retaliatory Employment Actions.................26

        B. *Burlington Northern* Did Not Hold That Different Standards Apply To Discriminatory And Retaliatory Changes In Employment That Amount To Adverse Employment Actions.......................................................27

i

C. The District Court's Interpretation of *Chambers'* Effect On *Burlington Northern* Produced An Invidious Result................................29

D. Defendant's Attempt To Diminish *Chambers* Was Meritless
..............................................................................................30

II. The Actions Plaintiff Challenges Are Cognizable After *Chambers* As Discriminatory And Retaliatory Adverse Employment Actions
..............................................................................................31

A. Leach Was Subject To Multiple Adverse Employment Actions
..............................................................................................31

B. Even Individually, Defendant's Actions Are Actionable Under *Burlington Northern*................................................................33

III. The District Court Improperly Disaggregated Defendant's Actions
..............................................................................................36

IV. The Record Is Replete With Evidence Of Discrimination and Retaliation................................................................................38

A. The District Court Improperly Resolved Credibility Issues..............40

B. The Mint Never Explained Its Caricature Of Leach's Management
..............................................................................................40

C. Bailey and O'Connor Were Deceitful................................................41

1. O'Connor Was Not Credible................................................41

2. Bailey Was Also Not Believable........................................43

D. The District Court Reached Erroneous Conclusions Based On Other Impermissible Assessments Of Credibility........................45

1. Bailey Admitted He Did Not Believe Medina........................45

2. The District Court Impermissibly Distorted Bailey's Admissions..........................................................................46

a. Bailey Was Not Waiting On OIG...................................47

b. The Court's Assessment of Bailey Disproved His Open-Mindedness................................................................47

c. Bailey Also Fabricated About How Leach Came To Be Suspended....................................................................48

V. The Record Is Brimming With Evidence Of Discrimination And Retaliation In Addition To Defendant's Lack Of Credibility....................48

A. Motl's Treatment of Dickerson And The Cooperation of Bailey And O'Connor Is Highly Probative ........................................48

ii

B. There Is Direct Evidence Defendant Retaliated Against Leach
..............................................................................................50

C. Defendant's Top Executives Are Antagonistic To African Americans
Who Participate In Protected EEO Activities.....................................50

D. The Mint Violated Written Personnel Policies....................................50

E. There Is Substantial Evidence Of Temporal Proximity......................51

VI.   A Reasonable Juror Could Conclude That Defendant Discriminated And
Retaliated Against Leach............................................................................52

A. There Was No Decision To Open An Administrative Investigation
..............................................................................................52

B. There Was No Need To Idle, Detail, And Reassign Leach Permanently
And Involuntarily.............................................................................53

C. Bailey And O'Connor Were Not Honest Brokers...............................54

**CONCLUSION**................................................................................................55

# TABLE OF AUTHORITIES

## Cases

*Aka v. Washington Hospital Ctr.,*
    156 F.3d 1284 (D.C. Cir. 1998)...............................................38, 39, 40, 42, 48
*Anderson v. Liberty Lobby*,
    477 U.S. 242, (1986)...............................................................................25, 40
*Ayissi-Etoh v. Fannie Mae*,
    712 F.3d 572, (D.C. Cir. 2013).........................................................................51
*Babb v. Wilkie*,
    140 S.Ct. 1168 (2020)..................................................................................30
*Baloch v. Kempthorne*,
    550 F.3d 1191, (D.C. Cir. 2008).......................................................................36
*Beard v. Preston*,
    576 F.Supp.2d 93, (D.D.C. 2008)...............................................................40, 52
*Bostock v. Clayton County, Georgia*,
    140 S.Ct. 1731 (2020)..................................................................................37
*Brady v. Office of Sergeant at Arms*,
    520 F.3d 490 (D.C. Cir. 2008)...............................................................25, 38, 39, 48
*Brown v. Brody*,
    199 F.3d 446 (D.C. Cir. 1999)...........................................................................26
*Burke v. Gould*,
    286 F.3d 513 (D.C. Cir. 2002)...........................................................................35
*Burlington Industries, Inc. v. Ellerth*,
    524 U.S. 742 (1998).......................................................................................34
*Burlington Northern & Santa Fe Railway Co. v. White*,
    548 U.S. 53 (2006)...........................................................27, 28, 29, 30, 33, 35
*Celotex Corp. v. Catrett*,
    477 U.S. 317, (1986)......................................................................................45
*Chambers v. District of Columbia*,
    35 F.4th 870, (D.C. Cir. 2022).....................24, 26, 27, 29, 30, 31, 32, 33, 35
*Clark v. Johnson*,
    206 F.Supp.3d 645 (D.D.C. 2016).....................................................................35
*Clark County School District v. Breeden*,
    532 U.S. 268, (2001)................................................................................40, 52
*Cleveland v. Policy Management Systems, Corp.*,
    526 U.S. 795, (1999)......................................................................................43
*Czekalski v. Peters*,
    475 F.3d 360, (D.C. Cir. 2007).........................................................................33

*Feld v. Fireman's Fund Ins. Co.*,
    909 F.3d 1186, (D.C. Cir. 2018)..................................................25
*Fischer v. Forestwood Co., Inc.*,
    525 F.3d 972, (10th Cir. 2008)...................................................45
*George v. Leavitt*,
    407 F.3d 405, (D.C. Cir. 2005)...................................................39
*Harding v. Gray*,
    9 F.3d 150, (D.C. Cir. 1993)......................................................37
*Hemi Group, LLC v. City of New York*,
    559 U.S. 1, (2010)...................................................................37
*Holmes-Martin v. Leavitt*,
    569 F.Supp.2d 184, (D.D.C. 2008)............................................36
*Itel Capitol Corp. v. Cups Coal, Inc.*,
    707 F.2d 1253, (11th Cir. 1983)............................................44, 45
*Jones v. Castro*,
    168 F.Supp.3d 169, (D.D.C. 2016).............................................35
*Kachmar v. SunGard Data Systems, Inc.*,
    109 F.3d 173, (3d Cir. 1997)................................................40, 52
*Kalinoski v. Gutierrez*,
    435 F.Supp.2d 55, (D.D.C. 2006)...............................................52
*Koninklijke Luchtvaart Maatschappij N.V. KLM Royal Dutch Airlines Holland v. Tuller*,
    292 F.2d 775 (D.C. Cir. 1961).....................................................45
*Kyriakopoulos v. George Washington University*,
    866 F.2d 438, (D.C. Cir. 1989)...................................................45
*Lathram v. Snow*,
    336 F.3d 1085, (D.C. Cir. 2003).................................2, 39, 40, 52
*Mastro v. PEPCO*,
    447 F.3d 843, (D.C. Cir. 2006)...................................................37
*Mattern v. Eastman Kodak Co.*,
    104 F.3d 702, (5th Cir. 1997)......................................................28
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574, (1986)................................................................26
*McGrath v. Clinton*,
    666 F.3d 1377, (D.C. Cir. 2012)..................................................38
*Meritor Savings Bank, FSB v. Vinson*,
    477 U.S. 57, (1986)..................................................................32
*Moore v. Hartman*,
    571 F.3d 62, (D.C. Cir. 2009)......................................................26
*Pardo-Kronemann v. Jackson*,

v

541 F.Supp.2d 210, (D.D.C. 2008)..............................................................52

*Pardo-Kronemann v. Jackson*,
601 F.3d 599 (D.C. Cir. 2010)....................................................................52

*Parker v. Baltimore & Ohio RR Co.*,
652 F.2d 1012...............................................................................................4

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133, (2000)..............................22, 25, 26, 39, 40, 41, 49

*Rochon v. Gonzales*,
438 F.3d 1211, (D.C. Cir. 2006).........................................................29, 33

*Simple v. Walgreen Co.*,
511 F.3d 668, (7th Cir. 2007)....................................................................45

*Singletary v. District of Columbia*,
351 F.3d 519, (D.C. Cir. 2003)......................................................25, 40, 52

*Sprint v. Mendelsohn*,
552 U.S. 379, (2008)........................................................................25, 39, 49

*St. Mary's Honor Center v. Hicks*,
509 U.S. 502, (1993)...................................................................................43

*Staub v. Proctor Hospital*,
562 U.S. 411, (2011)..........................................................................25, 37, 38

*Stewart v. Ashcroft*,
352 F.3d 422, (D.C. Cir. 2003)...................................................................35

*Stoe v. Barr*,
960 F.3d 627, (D.C. Cir. 2020).............................................................22, 26

*Taylor v. Small*,
350 F.3d 1286, (D.C. Cir. 2003)................................................................29

*Velikonja v. Gonzales*,
466 F.3d 122, (D.C. Cir. 2006)...................................................................35

*Ware v. Billington*,
344 F.Supp.2d 63, (D.D.C. 2004)..............................................................35

*White v. Burlington Northern & Santa Fe Railway Co.*,
2000 WL 35448693, at *1 (W.D. Tenn. Nov. 16, 2000)..............................28

*White v. Burlington Northern & Santa Fe Railway Co.*,
310 F.3d 443, (6th Cir. 2002)....................................................................28

*White v. Burlington Northern & Santa Fe Railway Co.*,
364 F.3d 789, (6th Cir. 2004)....................................................................28

**Statutes**

5 U.S.C. § 2302(a)(2)(A).......................................................................30, 31

5 U.S.C. §7512............................................................................................31

vi

29 U.S.C. §633a(a)................................................................30

42 U.S.C. §2000e-2(a)(1).....................................20,26, 31, 32

42 U.S.C. §2000e-3(a)..........................................................20

42 U.S.C. §2000e-16(a).........................................................20

## **Rules**

Fed. R. Civ. P. 56(c)............................................................25

Fed. R. Civ. P 56(c)(1)(B)....................................................45

Fed. R. Evid. 801(d)(2)(D)....................................................45

Fed. R. Evid. 803(6)..............................................................44

## **Regulations**

29 C.F.R. §1614.105(c).........................................................44

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| "ADEA": | Age Discrimination in Employment Act |
| "AI": | Administrative Investigation |
| "FY": | Full Year |
| "IT": | Information Technology |
| "OIG": | Office of Inspector General |
| "PD": | Position Description |
| "the Mint": | United States Mint |
| "Title VII": | Title VII of the Civil Rights Act of 1964 |
| "WPA": | Whistleblower Protection Act |

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This action was originally filed in the United States District Court for the District of Columbia on December 21, 2018. ECF #1. The Complaint was amended as a matter of right on January 14, 2019. ECF #5. Jurisdiction of the District Court was based upon 28 U.S.C. §1331 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e-2(a)(1), 2000-3(a) as incorporated into 42 U.S.C. §§ 2000e-16(a), (c), concerning discrimination and retaliation in federal employment.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

This appeal lies from the Memorandum Opinion and Order of March 14, 2023, issued by the Hon. James E. Boasberg granting summary judgment to defendant. ECF #73, ECF #74.

A notice of appeal was timely filed on May 3, 2023. ECF #78.

The district court's Order resolved all the parties' claims.

## STATEMENT OF ISSUES

I.    Whether *Chambers v. District of Columbia*, 35 F.4[th] 870 (D.C. Cir. 2022) (*en banc*), held that the standard for changes in employment that are actionable as discriminatory under Title VII, 42 U.S.C. § 2000e-3(a)(1), is less demanding than the standard for retaliatory changes under 42 U.S.C. § 2000e-3(a), when *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 65-67 (2006), held that Title VII's prohibition on retaliation is broader and more flexible.

II.    Whether idling, detailing, and transferring plaintiff involuntarily; placing appellant under investigation; and proposing to suspend; and suspending plaintiff are actionable under both *Chambers* and *Burlington Northern* because they changed the terms and conditions of plaintiff's employment and also caused objective, tangible harm.

III.    Whether the district court erroneously dissected defendant's unlawful actions toward plaintiff by failing to appreciate that they were all related under standards of "but-for" proximate cause.  *Staub v. Proctor Hospital,* 562 U.S. 411, 421-22 (2011).

IV.    Whether the district court erroneously resolved undisputed material facts, genuinely disputed material facts, and credibility issues in defendant's favor, particularly in erroneously concluding that defendant's unlawful referral of plaintiff

for investigation by the Treasury Office of Inspector General was irrelevant in the mistaken belief that defendant authorized a different type of investigation earlier.

V.    Whether the district court erroneously ignored highly probative evidence, including defendant's concealment it was senior executives and not plaintiff's supervisors who directed his referral for investigation; defendant's lack of credibility; the incongruity between plaintiff's contemporaneous, uniform superlative appraisals and its *post hoc* mischaracterization of plaintiff as a manager; its almost identical, simultaneous discrimination and retaliation toward an African American "me too" witness; and its unlawful employment actions during plaintiff's active pursuit of an EEO complaint.

## ADDENDUM OF STATUTES, RULES, AND REGULATIONS

### 5 U.S.C. § 2302: Prohibited Personnel Practices

**(a)(1)** For the purpose of this title, "prohibited personnel practice" means any action described in subsection (b).

**(2)** For the purpose of this section—

**(A)** "personnel action" means—

**(i)** an appointment;

**(ii)** a promotion;

**(iii)** an action under chapter 75 of this title or other disciplinary or corrective action;

**(iv)** a detail, transfer, or reassignment;

**(v)** a reinstatement;

**(vi)** a restoration;

**(vii)** a reemployment;

**(viii)** a performance evaluation under chapter 43 of this title or under title 38;

**(ix)** a decision concerning pay, benefits, or awards, or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in this subparagraph;

**(x)** a decision to order psychiatric testing or examination;

**(xi)** the implementation or enforcement of any nondisclosure policy, form, or agreement; and

**(xii)** any other significant change in duties, responsibilities, or working conditions; with respect to an employee in, or applicant for, a covered position in an agency, and in the case of an alleged prohibited personnel practice described in subsection (b)(8), an employee or applicant for employment in a Government corporation as defined in section 9101 of title 31;

**5 U.S.C. § 7512: Actions Covered**

This subchapter applies to—

**(1)** a removal;

**(2)** a suspension for more than 14 days;

**(3)** a reduction in grade;

**(4)** a reduction in pay; and

**(5)** a furlough of 30 days or less;

but does not apply to—

**(A)** a suspension or removal under section 7532 of this title,

**(B)** a reduction-in-force action under section 3502 of this title,

**(C)** the reduction in grade of a supervisor or manager who has not completed the probationary period under section 3321(a)(2) of this title if such reduction is to the grade held immediately before becoming such a supervisor or manager,

**(D)** a reduction in grade or removal under section 4303 of this title,

**(E)** an action initiated under section 1215 or 7521 of this title, or

**(F)** a suitability action taken by the Office under regulations prescribed by the Office, subject to the rules prescribed by the President under this title for the administration of the competitive service.

**29 U.S. Code § 633a: Nondiscrimination on Account of Age in Federal Government Employment**

**(a)**Federal agencies affected

All personnel actions affecting employees or applicants for employment who are at least 40 years of age (except personnel actions with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of title 5, in executive agencies as defined in section 105 of title 5 (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Regulatory Commission, in those units in the government of the District of Columbia having positions in the competitive service, and in those units of the judicial branch of the Federal Government having positions in the competitive service, in the Smithsonian Institution, and in the Government Publishing Office, the Government Accountability Office, and the Library of Congress shall be made free from any discrimination based on age.

**42 U.S.C. § 2000e-2**: **Unlawful Employment Practices**
**(a)** Employer practices

It shall be an unlawful employment practice for an employer—

**(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

## 42 U.S.C. § 2000e-3: Other Unlawful Employment Practices

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

**42 U.S.C. § 2000e–16 - Employment by Federal Government**

**(a)** Discriminatory practices prohibited; employees or applicants for employment subject to coverage. All personnel actions affecting employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of title 5, in executive agencies as defined in section 105 of title 5 (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Regulatory Commission, in those units of the Government of the District of Columbia having positions in the competitive service, and in those units of the judicial branch of the Federal Government having positions in the competitive service, in the Smithsonian Institution, and in the Government Publishing Office, the Government Accountability Office, and the Library of Congress shall be made free from any discrimination based on race, color, religion, sex, or national origin.

## 29 C.F.R. § 1614.105: Pre-Complaint Processing

**(a)** Aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter.

**(1)** An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.

**(2)** The agency or the Commission shall extend the 45–day time limit in paragraph **(a)(1)** of this section when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

**(b)(1)** At the initial counseling session, Counselors must advise individuals in writing of their rights and responsibilities, including the right to request a hearing or an immediate final decision after an investigation by the agency in accordance with § 1614.108(f), election rights pursuant to §§ 1614.301 and 1614.302, the right to file a notice of intent to sue pursuant to § 1614.201(a) and a lawsuit under the ADEA instead of an administrative complaint of age discrimination under this part, the duty to mitigate damages, administrative and court time frames, and that only the claims raised in pre-complaint counseling (or issues or claims like or related to issues or claims raised in pre-complaint counseling) may be alleged in a subsequent complaint filed with the agency. Counselors must advise individuals of their duty to keep the agency and Commission informed of their current address and to serve copies of appeal papers on the agency. The notice required by paragraphs (d) or (e) of this section shall include a notice of the right to file a class complaint. If the aggrieved person informs the Counselor that he or she wishes to file a class complaint, the Counselor shall explain the class complaint procedures and the responsibilities of a class agent.

**(2)** Counselors shall advise aggrieved persons that, where the agency agrees to offer ADR in the particular case, they may choose between participation in the alternative dispute resolution program and the counseling activities provided for in paragraph (c) of this section.

**(c)** Counselors shall conduct counseling activities in accordance with instructions contained in Commission Management Directives. When advised that a complaint has been filed by an aggrieved person, the Counselor shall submit a written report

within 15 days to the agency office that has been designated to accept complaints and the aggrieved person concerning the issues discussed and actions taken during counseling.

**(d)** Unless the aggrieved person agrees to a longer counseling period under paragraph (e) of this section, or the aggrieved person chooses an alternative dispute resolution procedure in accordance with paragraph (b)(2) of this section, the Counselor shall conduct the final interview with the aggrieved person within 30 days of the date the aggrieved person contacted the agency's EEO office to request counseling. If the matter has not been resolved, the aggrieved person shall be informed in writing by the Counselor, not later than the thirtieth day after contacting the Counselor, of the right to file a discrimination complaint. The notice shall inform the complainant of the right to file a discrimination complaint within 15 days of receipt of the notice, of the appropriate official with whom to file a complaint and of the complainant's duty to assure that the agency is informed immediately if the complainant retains counsel or a representative.

**(e)** Prior to the end of the 30–day period, the aggrieved person may agree in writing with the agency to postpone the final interview and extend the counseling period for an additional period of no more than 60 days. If the matter has not been resolved before the conclusion of the agreed extension, the notice described in paragraph (d) of this section shall be issued.

**(f)** Where the aggrieved person chooses to participate in an alternative dispute resolution procedure in accordance with paragraph (b)(2) of this section, the pre-complaint processing period shall be 90 days. If the claim has not been resolved before the 90th day, the notice described in paragraph (d) of this section shall be issued.

**(g)** The Counselor shall not attempt in any way to restrain the aggrieved person from filing a complaint. The Counselor shall not reveal the identity of an aggrieved person who consulted the Counselor, except when authorized to do so by the aggrieved person, or until the agency has received a discrimination complaint under this part from that person involving that same matter.

**Management Directive 110, 2-6, 4**

**4.** Seek a resolution of the dispute at the lowest possible level, unless the agency offers EEO ADR and the aggrieved individual agrees to participate in the EEO ADR program. If the dispute is resolved in counseling, the EEO Counselor must document the resolution. (Facilitator, translator, messenger, and suggestion maker)

**Management Directive 110 – Appendix B-5**

**b.** Early in the process, the EEO Counselor must determine what documents control the action taken; i.e., whether there is a written agency procedure that must be followed in certain situations. For example, if the issue involves a promotion action, the EEO Counselor should decide if it is necessary to review the applicable promotion plan and, if so, determine where the plan is maintained. The EEO Counselor may be able to obtain needed information from official personnel folders, supervisors' working files, or wherever the personnel action is maintained, such as a promotion folder. By making inquiries, the EEO Counselor will soon learn where such documents are kept and who maintains the records.

When looking at individual records, the EEO Counselor should keep in mind that his/her role is to achieve informal resolution at the lowest possible level, so the number of records reviewed should be kept to a minimum. Only records of the aggrieved person and of those who allegedly received different, more favorable treatment should be examined in an effort to achieve informal resolution.

**Federal Rules of Civil Procedure, Rule 56. Summary Judgment**
**(c) Procedures.**

**(1)** Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**(2)** Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3)** Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

**(4)** *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

xxiii

**Federal Rules of Evidence, Rule 801. Definitions That Apply to This Article; Exclusions from Hearsay**

**(d)** Statements That Are Not Hearsay. A statement that meets the following conditions is not hearsay:

**(2)** *An Opposing Party's Statement*. The statement is offered against an opposing party and:

**(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

**Federal Rules of Evidence, Rule 803. Exceptions to the Rule Against Hearsay**

**(6)** Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:
**(A)** the record was made at or near the time by — or from information transmitted by — someone with knowledge;
**(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
**(C)** making the record was a regular practice of that activity;
**(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
**(E)** the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

## STATEMENT OF THE CASE

### Background

Until the actions that underlie this suit, Lester Leach, an African American, was the Director (GS-15) of the Security Division in the Protection Directorate of the U.S. Mint ("the Mint").  JA:   Leach formerly had two branches and 13 white collar employees reporting to him.  JA:   He was competitively selected as Director in 2006 by Bill Bailey, also an African American, who became his first-line supervisor.  The following year, Dennis O'Connor, a Caucasian, became Leach's second-line supervisor.  JA:   All of Leach's full-year appraisals under Bailey and O'Connor were Outstanding or the equivalent.  JA:

Bailey admitted under oath that all of Leach's appraisals were accurate.  JA: None mentioned an alleged conflict between Leach and any of his subordinates, Bailey, O'Connor, or anyone else.  JA:   On the contrary, following O'Connor's lead, Leach held employees accountable and worked a remarkable turnaround in a dysfunctional division that was populated by poor performers and malcontents.  One physically threatened another employee in a wheelchair.  JA:

Leach carried out O'Connor's directions firmly and fairly.  Leach saw to it that three African American women in a personnel security group were not downgraded, as O'Connor wanted, and gave them a chance to succeed by bringing their performance up to O'Connor's standards.  JA:

1

In the district court, the Mint tried to paint a very different picture of Leach, but Leach rebutted every single allegation in a highly detailed, extensive Declaration that was supported by Leach's performance appraisals, deposition testimony, and many documents.  JA:  For example, the Mint contended that its treatment of Leach was justified by a complaint in 2010 from Verland Graham-Faulk, a former subordinate.  JA:  Graham-Faulk, one of the three African American women whose jobs Leach saved, was failing to meet performance standards O'Connor directed Leach to implement.  JA:  Once she did, Leach arranged for Graham-Faulk to receive Mint's highest award, as he did for another so-called complainant Kevin Nelson.  *Id*.; JA:  The year of these alleged incidents, O'Connor and Bailey gave Leach an Exceptional rating, the highest, and two cash awards (JA: ).

Another example of the Mint's overstatement supposedly occurred in 2015, when Leach was preparing to take action against Matthew Graddy for mysteriously disappearing while teleworking.  In fact, Bailey had directed Leach to address Graddy's unsatisfactory performance and O'Connor was pleased with how Leach was coordinating with HR.  *Compare* JA: *with* JA:  That year, Leach earned another Outstanding rating and three cash awards (JA:  ).

The Mint also claimed that because "Leach was so contentious," Bailey "removed" Leach from a joint project supposedly because an employee in another office, Tiffany McGinn, complained about him.  JA: JA:  Bailey admitted at his

2

deposition he never looked into that complaint. Bailey "collaborated" with Leach and, "without faulting" Leach, the two came up with a diplomatic way to complete an important project.    JA:

Leach's FY 2016 performance appraisal was issued shortly before he was removed from his position. Bailey and O'Connor gave Leach a perfect overall score and rated him perfect in "Supervisory Leadership" and "Teamwork;" "*fostering good rapport with co-workers and building a climate of trust, professionalism' and camaraderie*;" "advancing the goal of a well-diversified work force through outreach to diverse populations;" and promoting "Protection Team productivity and success." JA: (emphasis supplied). Year in and year out, they applauded Leach for being "a superb team member," "exceed[ing] in the area of Supervisory Leadership" and "promot[ing] a work environment ... characterized by ... tolerance, inclusion, and sensitivity," and "lead[ing] by enabling Division staff. All nine of Leach's appraisals contained language like this. JA:

None of this appears in the decision below. It makes no mention of O'Connor's and Bailey's unsuccessful attempts to conceal that it was not they who caused Leach to be investigated, but rather , two of the Mint's most senior executives, one who wanted Leach investigated because he filed an EEO complaint and the other who was a target of that complaint.

The district court got uncontroverted evidence about two key dates in the sequence of events leading up to and during Leach's investigation exactly backward; improperly turned Bailey's admissions that he did not believe the complaint that led to Leach's removal into proof that he was not biased; and uncritically accepted Bailey and O'Connor's easily pierced, pretextual accounts of why they took action against Leach.

What follows is the actual account of how Leach came to be placed under investigation, idled, detailed, disciplined, removed from supervision, and involuntarily transferred, virtually none of which appears in the district court's decision.

### Leach's Original Protected EEO Activity

In the summer of 2016, Leach filed an administrative complaint of discrimination over being denied IT security training at Harvard University. JA: . Leach named four senior Mint officials: Acting Director Rhett Jeppson; David Motl, the Mint's then-current Chief Administrative Officer and soon-to-be an acting Deputy Director; Deputy Director Richard Peterson; and Acting Chief Information Officer Joseph Gioeli. JA: Am. Cplt. [ECF #5-1], ¶¶5, 28/Answ. [ECF #8], ¶¶5, 28.[1]

---

[1]     Leach did not pursue this complaint as part of this case; its outcome is irrelevant. *Parker v. Baltimore & Ohio RR Co.,* 652 F.2d 1012, 1019 (D.C. Cir. 1981).

In late June or July of 2016, although Bailey and O'Connor concurred, Motl recommended that Peterson deny Leach's request.   Peterson thought his denial important enough to bring it to Jeppson's attention as one of "the issues of the day" in one of Jeppson's three weekly "stand-up" briefings.  (JA:  ) Motl, Chief Counsel Jean Gentry, and the Director's Chief of Staff also attended.  (JA:)   This was the only time Peterson brought an employee's request for training up with a Mint Director.  JA:   Everyone present knew of or would soon learn that Leach initiated the EEO process in mid-July and filed a formal EEO complaint in mid-August.  JA: By early December of 2016, Motl, Jeppson, Peterson, and Gioeli each had executed an Affidavit denying having discriminated against Leach.  JA:

### The Medina Email

In the summer of 2015, Leach hired a new Branch Chief, Arnaldo Medina. JA:    Bailey and O'Connor rated Leach Outstanding that year, specifically recognizing Leach for having "onboarded" Medina and "quickly incorporat[ing]" Medina "to an effective level of performance." *Id.*; JA:  In FY 2016, Leach approved Medina's conversion to permanent status and gave Medina an Excellent rating and a bonus in late October of 2016. JA:

Nonetheless, on December 21, 2016, shortly after Leach received another Outstanding rating, Medina emailed Bailey and O'Connor of Leach's alleged of "constant condescending and verbally abusive behavior" since he was hired 18

months earlier.  JA:   Medina admitted under oath that his allegations were untrue.
JA:   In the months leading up to Medina's email, Leach repeatedly gave him time off on short notice: to be with his family, care for his wife and son during medical matters and emergencies; return home to New Jersey to attend to a personal matter; see an orthopedist for an injured knee; change his Alternate Work Schedule on short notice; and to see his elderly parents.  Medina admitted Leach was kind, caring, and genuinely concerned about Medina father's medical condition, the incident that supposedly triggered his email.  JA:   Medina also admitted Leach had boosted his career.  JA:

### Bailey and O'Connor Knew Medina's Allegations Were False

By the time he sent his email, Medina had already approached Bailey three or four times to complain about his relationship with Leach.  JA:   Each time, Bailey brushed him off, telling Medina "Hey, that's just Lester."  JA:   Bailey knew from his day-to-day supervision that Leach allowed Medina to assume an important project from him and was concerned about Medina's family when his father had slipped and badly hurt himself.  JA:   Notably, shortly before Medina's email, Bailey and O'Connor gave Leach another Outstanding rating with a perfect overall score of 200 and perfect scores for Teamwork and Supervisory Leadership.  JA:

## Concealment Of How The Mint Came To Refer Leach To OIG

Motl's explanation at his deposition is the most thorough account of how Leach came to be referred to OIG.  "O'Connor approached" Motl's "admin and said he needed to meet with" Motl "about an EEO concern."  JA:   On January 9, 2017, Motl had a "follow-up" with O'Connor and Chief Counsel Gentry, during which Gentry advised the two "that the Inspector General's Office had" instructed the Mint to refer "[a]ny type of EEO activity that would somehow damage or cause negative impact to the Mint" to it.  JA: Motl added:

> Mr. O'Connor said that he believed it needed to be referred because there could be potential for criminal concerns.

JA: (emphasis added).  Motl's testimony had many facets.

*First*, there was a meeting with Gentry and Motl which O'Connor attended. JA:

*Second*, the "EEO concern" that led to the meeting could not have been Medina's email, which lacked allegations of discrimination or retaliation.  The only possible "EEO concern" was Leach's EEO 2016 complaint against Motl for denying him training at Harvard.  JA: .[2]

---

[2]     On December 19, 2016, Motl sent a Mint-wide email announcing he chose a protégé from the Bureau of Prisons, Kristie McNally, to be acting CFO.  Because Leach had identified McNally as a comparator in his complaint, he forwarded Motl's email to his EEO coordinator.  JA:

7

*Third*, because Leach's EEO complaint named Motl and other senior Mint officials up to the acting Director, unlike the Medina email, it had the "potential" to affect the Mint negatively.  JA:

*Fourth*, O'Connor fabricated that referral to OIG was justified because of criminal allegations against Leach.  There was no reference to anything criminal in the Medina email, but it did place Leach in jeopardy of being prosecuted by the U.S. Attorney's Office.  JA:

*Finally*, Motl's attempt to point the finger at the Treasury Department for placing Leach under investigation to protect the Trump administration was puzzling; former president Trump was not sworn in until January 20, 2017.

The affidavit O'Connor gave during the investigation of Leach's EEO complaint stated that he referred Leach to OIG only after he "briefed" Motl and Gentry.  JA:  When questioned under oath about this "briefing," O'Connor's account differed markedly from Motl's.

> Q:  Are you saying that you [n]ever spoke with them or met with them or talked with them simultaneously?
>
> A:  No, I never met with them simultaneously.[3]

---

[3]    The transcript reads O'Connor being asked "Are you saying that you had ever spoke with" Motl and Gentry.  O'Connor's answer "that he never met" with Motl and Gentry "simultaneously" is the important part of this colloquy regardless of the question put to O'Connor.  JA:

The decision was mine.  I made the decision.  In no way shape or form did the legal counsel suggest I send [the referral] to the IG.

JA:

O'Connor sent the letter referring Leach to OIG a week later, with inflammatory, false allegations going far beyond Medina's email ensuring OIG opened an investigation, writing "in my initial review of" Medina's email, "as well as past complaints involving Lester Leach," he allegedly found a "pervasive abuse of authority in [Leach's] handling of subordinate employees."  JA:

Bailey's EEO Affidavit gave still a different account.  Bailey stated that on January 9, 2017, he briefed O'Connor about "my decision" to conduct an Administrative Investigation ("AI") into Medina's allegations; O'Connor briefed Gentry and Motl of Bailey's decision, and afterwards, Gentry "recommended I refer the" Medina email to OIG.  JA:   Bailey could not have made a decision to open an AI into Leach before then because an AI "requires a formal appointment memorandum" written by an "appointing official" by an executive.  JA:   The only inquiry that Bailey could have conducted unilaterally was a Management Inquiry which, despite its ominous sounding name, is "a supervisor's routine inquiry" concerning minor misconduct.  JA:

## Concurrent Discrimination And Retaliation Against A Protection Chief

Evidence of Motl's contemporaneous discrimination and retaliation against Lisa Dickerson, an African American Field Chief in Protection who filed an EEO

9

complaint against Motl, went unrebutted by defendant and unmentioned by the district court. Dickerson's grade was equivalent to Leach's and she had supervisory duties over Protection employees. Dickerson also possessed an unbroken string of outstanding appraisals from Bailey and O'Connor.  JA:   The Mint admitted that Dickerson was placed under investigation "under the same or similar circumstances" as Leach.  JA:

Dickerson initiated the EEO process identifying Motl as responsible for having her placed under investigation.  JA:  Dickerson's formal complaint was originally based on race and retaliation like Leach's.  JA:   She also identified Motl there.  JA:

Dickerson originally alleged that in March 2016 Jeppson and Peterson "did a mini town hall" with some of her officers who were still complaining about their shifts being reduced from 12 hours to 10 hours two years earlier.  Peterson told informed Bailey that the Mint would be having a "disinterested party" conduct a "cultural assessment" of the environment in Dickerson's Division.  JA:   However, Motl countermanded that decision and instructed Bailey that the matter was being elevated to an AI, which is more serious and can result in "punitive action."  JA: Bailey was "clear" that Motl was responsible for increasing the scrutiny of Dickerson.  JA:

10

Motl retained an outside firm to conduct the Dickerson AI. It and concluded with an extensively documented 170-page report on July 10, 2016, which found that Dickerson had *not* created a hostile work environment, although she made "some missteps." JA:

O'Connor testified he was about to reinstate Dickerson as Chief, but Motl instructed him "to remove her from [her] position permanently." JA: Motl, on the other hand, pointed to O'Connor and Bailey as deciding to remove her. JA: In either event, Dickerson was reassigned to a non-supervisory position reporting to Bailey and performing special duties, just like Leach. JA: Dickerson remains in that position although Motl retired five years ago. JA:

### Motl's Antagonism Toward EEO Complainants

Motl was overtly antagonistic toward the EEO process and complainants. Former senior HR official AB (a pseudonym) testified about her involvement with a "tasker" from Treasury in 2017 asking the Mint, when Motl was Acting Director, for a description of "unnecessary barriers for addressing poor performance." JA:

Motl's draft response read: "The primary barrier to addressing poor performance is the EEO process." JA: Other draft responses by Motl also included the following language either *verbatim* or with slightly different wording.

Often, when supervisors begin the process of correcting poor performance, the employee will file an EEO complaint against the supervisor. The basis of the filing will be one of the protected

11

categories.  The Mint has found, in time, that these allegations were baseless.

JA:

### Gentry's Retaliatory Referral Of AB To OIG

AB originally disclosed Motl's statements in an Affidavit in the investigation of an EEO complaint by BB Craig, an African American in the Senior Executive Service.  JA:  AB's Affidavit recounted meetings at which Motl floated plans to remove Craig from the SES and make him quit, and denigrated Craig's ability to perform his job.  JA:  AB also testified at length at the *Craig* trial about Motl's efforts to retaliate and Craig prevailed on one Count.  JA:  *Craig v. Lew*, Civ. Action No. 14-1340 (RC), ECF #99.

While the *Craig* case was in the post-judgment phase, on July 10, 2018, McNally, Motl's Caucasian protégé from the Bureau of Prisons, emailed her supervisor, Margaret Yauss, complaining about AB's impeding her from succeeding Yauss, who in turn emailed Gentry to complaint about AB.  JA:  Gentry responded that an attorney on her staff who attended the *Craig* trial "will be reaching out ... to discuss a proposal" to have AB investigated.  JA:  AB was interviewed by an OIG investigator, who confided that his office "knew they were after you."  JA:

### Leach's EEO Complaint Over Being Referred For Investigation

Leach began the administrative EEO process that underlies this suit on January 18, 2017, over having been referred for investigation, relieved of his duties,

disciplined, and eventually reassigned involuntarily to a nonsupervisory, make-work position.  JA:   Bailey was interviewed by OIG Investigator Thomas Trimble on February 1, 2017.  JA:  The Mint pointed to Bailey's Declaration on summary judgment as allegedly proving that no matter what Bailey told Trimble, he and O'Connor "could not have been motivated by retaliatory animus."  JA:

> Prior to my interview with the OIG investigator on ***February 1, 2017***, I had no knowledge of Mr. Leach initiating an EEO process in which I was named as an alleged discriminating official.

JA:  (emphasis supplied).  This was untrue.  It was undisputed that two days before Bailey's interview with OIG, the EEO counselor in Leach's complaint spoke with Bailey to get his account about referring Leach for investigation and idling Leach. JA:

## Interference With OIG Objectivity

The Mint asserted over 50 times in its summary judgment motion that Medina's email, Medina's allegations, and Medina himself were the sole reason for Leach's referral to OIG.  JA:  Its Statement of Material Facts repeatedly stated that they were the causes of Leach being referred to OIG, investigated, relieved of supervisory responsibilities, and reassigned involuntarily.  JA:

O'Connor based his referral to OIG on allegations that went far beyond the Medina email.  It stated: "ln my initial review of [Medina's] allegation as well as past complaints involving Lester Leach, I have found what appears to be his

pervasive abuse of authority in his handling of subordinate employees and as such the matter is provided for your review and determination." JA:  Although he had signed all of Leach's glowing appraisals, O'Connor told Trimble that Leach "is overbearing and abusive." *Compare* JA: through JA:  *with* JA:

Bailey admitted under oath that Leach's Outstanding and perfect performance appraisals were uniformly accurate. JA:  Bailey also admitted that he did not believe Medina's email when he received it on December 21, 2016, and still did not believe it two and a half weeks later when he referred Leach to OIG and took Leach out of his job. JA:  Nonetheless, two days after Bailey learned that Leach filed his second EEO complaint, naming him and O'Connor, Bailey told Trimble: "Leach rides Medina," adding Leach "is intimidated by Medina." *Compare id*. *with* JA: .[4]

Bailey withheld from Trimble all of Leach's stellar performance appraisals and never mentioned his perfect scores for Teamwork, instead falsely reporting that "Leach is unable to work with other USM employees." Bailey only directed Trimble to individuals with animus towards Leach. JA:  Bailey also admitted at his deposition to having no issue with Leach's supervision of many named subordinates yet brought none to OIG's attention. *Compare* JA: *with* JA:  And as demonstrated

---

[4]     Bailey also told Trimble that because "Leach was so contentious," he "removed" Leach from a project with another office which, as demonstrated earlier, was false. *Compare* JA: *with* JA:

earlier, Bailey misrepresented Trimble that he'd intervened in Leach's disciplining a subordinate, when he and O'Connor believed Leach handled this situation perfectly. *Compare* JA: *with* JA:

## OIG's Report

Leach was never informed by OIG what he was being investigated for, JA: , and Bailey never gave Trimble anything that reflected positively on Leach. JA: Predictably, OIG found "Leach subjected" Medina "to condescending and verbally abusive behavior over several months." JA: Ironically, that was the very period Medina admitted to Leach being kind and caring. JA:

## Bailey's Proposal To Suspend Leach

A year after Bailey detailed Leach out of his position, on January 31, 2018, Bailey proposed to suspend him for five days without pay. JA: Relying entirely on the OIG report, ignoring his contemporaneous appraisals of Leach, and never having given OIG anything favorable about Leach, Bailey first charged Leach with having been "verbally abusive and condescending toward Mr. Medina" from the day he was hired. JA: Yet in Leach's appraisal for FY 2016, Bailey and O'Connor awarded Leach a perfect score for fostering "a climate of trust, professionalism, and camaraderie" and building "good rapport with coworkers" in his division. JA: Indeed, Bailey conceded under oath that his real opinion of Leach was in the

appraisals he'd withheld from Trimble—ratings that he and O'Connor took seriously. JA:  through JA:

Next, Bailey accused Leach of tardily paying for government-approved travel that appeared on his government-issued credit card, charges that were not Leach's responsibility but the Mint's. JA:  Bailey knew that Leach was blameless.  Leach's responsibility was to submit a voucher for approval, forward the approved voucher to the Mint's finance department, and follow up if the finance department failed to make payment to the service provider. JA:  Bailey conceded he had approved Leach's vouchers; that they had been submitted to the finance department for payment; that Leach was due a credit for the remainder; and that Leach had followed up on *the Mint's* error. JA:

Bailey's third specification related to Leach's responding to a couple of emails.  The first part was that Leach did not respond to an email Bailey sent on Wednesday December 20, 2017, to notify him within the next two days of any actions Leach had taken or was going to take to pay the credit card bill.  JA:  However, Leach was out on approved leave and overlooked it when he returned; at the time, he was caring for his wife's complications from joint replacement surgery. JA:

While out on FMLA leave again, on January 2, 2022, Leach emailed Bailey and O'Connor to say that he had just seen Bailey's email and that he would resolve

the issue shortly.  JA:  When the Mint travel office emailed Bailey that Leach's card was still delinquent, Leach emailed Bailey the confirmation of payment, which *Leach had paid with his own funds* even though the delinquency was not his fault. JA:

The other part of this specification was based on an email from Bailey approving a change in Leach's telework day to Wednesday January 17, 2018, from Thursday January 18, 2017.  JA:  In that email, Bailey asked Leach to tell him what he would be working on while teleworking that day.  JA:  Because Leach did not get back right away, Bailey charged him again.  JA:

### O'Connor's Decision to Suspend Leach

O'Connor knew that the years of Outstanding appraisals he and Bailey had authored depicted the real Lester Leach.  O'Connor admitted, he would "only approve" Bailey's "ratings if they accurately reflected a division director's performance."  JA:  Despite knowing that Leach's years of contemporaneous Outstanding appraisals, O'Connor found that Leach was abusive toward subordinates.  JA:

A perfect example of O'Connor's mendacity was his claim that Leach had mistreated Graddy.  JA:  In fact, O'Connor was *satisfied* with how Leach addressed Graddy's repeated "unacceptable" performance problems, including vanishing while teleworking, telling Bailey that Leach was playing it "by the numbers" in

17

coordinating closely with HR.  JA:  O'Connor also admitted having  no conception

what any of Medina's complaints were about, not even with Medina's statement

placed in front of him.  JA:

O'Connor, like Bailey, was privy to all eleven emails between Leach and the

travel department about his approved travel expenses.  JA:  Incredibly, O'Connor

testified under oath that *Leach pocketed the travel money*, a spurious claim which

was disproven by the emails Leach sent to the finance department and copied to

O'Connor and Bailey.  *Compare* JA: *with* JA:  Leach paid the bill from his own

funds and was not reimbursed.  JA: *compare* JA: *with* JA:

O'Connor, like Bailey, would have terminated Leach except for the

intervention of AB and one of her senior staff, who advised them the OIG report

"did not support ... removal."  JA:  Instead, O'Connor suspended Leach on April 11,

2018.  JA:   O'Connor claimed he reduced the suspension from five days to two

because the reduced sanction "will have the desired rehabilitative effect."  JA:  If

O'Connor was sincere, then logically a "rehabilitated" Leach would have been

restored as a GS-15 supervisor.  JA:

### Leach's EEO Record

In the district court, the Mint intimated that outcomes of two EEO complaints

by subordinates contributed to Leach's ouster.  JA:  One, by ▮▮▮▮▮▮▮, involved

a settlement Bailey knew nothing about and yet misrepresented to OIG as an adverse

18

decision. JA: For all the district court knew, the settlement was for a nuisance amount or even might have included that complainant's resignation. Leach detailed below that complainant wanted him to falsify a portion of her application for another position and that after he briefed Bailey about refusing, Bailey supported his decision. JA: As always, , during that year, Bailey and O'Connor gave Leach an Exceptional rating and the highest rating for "demonstrate[ing] clear support for Equal Employment Opportunity." JA:

The other complaint was filed by ██████████ an employee who was removed for performing at comedy clubs while on approved medical leave. JA: Bailey and O'Connor both knew that Leach was following advice from HR and gave Leach a perfect Outstanding rating for that year and a perfect score for promoting EEO. *Id*.; JA:

O'Connor is the one who dishonored Protection's commitment to EEO. He carried out the retaliatory reassignment of Dickerson at Motl's direction in late 2016, which ████████████████████ led to a ██████ settlement of her EEO complaint, side-lining Dickerson, and never returning Dickerson to her position. JA:

## Leach's Reassignment and Involuntary Detail

Bailey relieved Leach of his responsibilities as Division Chief on January 9, 2017, when the Mint decided to refer him to OIG. JA: From that moment forward,

19

Leach's career essentially ended.  JA:   While the investigation was pending, Leach was removed from his job and given almost nothing to do.  JA:

### Significant Duties Are Removed From Leach's Director Position

By May 2017, Leach was supposedly only out of his position "temporarily" until the OIG probe concluded. Motl and O'Connor made it impossible for him to return.  They created a new GS-15 position carved from many of Leach's most important duties.  JA:   The new Position Description ("PD") was prepared by AB, the same HR official who prevented O'Connor and Bailey from removing Leach. The PD included a note that it was not permanently classified as a GS-15 because there was no need for another GS-15 in Protection.  JA:   Once the position was established, O'Connor filled it without abolishing another position, in violation of Mint and Treasury Department hiring freeze policies.  JA:  .[5]

### Leach's Permanent Removal And Involuntary Reassignment

After a year out of his position, Leach was involuntarily detailed to the IT Directorate, where his assigned duties were vastly below the complexity and level of his former responsibilities.  JA:   Shortly after this suit was initiated, Bailey returned Leach to Protection permanently, in a non-supervisory position outside of Leach's chosen career field with duties far below his education and expertise.  JA:

---

[5]     Leach applied for the position hoping to be cleared by OIG before it was filled. JA:

## Procedural History

Leach initiated this action on December 21, 2018, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1), §2000e-3(a), and §2000e-16(a), challenging the foregoing employment actions as discriminatory and retaliatory.  JA: .[6]  The Memorandum Opinion and Order granting summary judgment resolving all parties' claims were issued on March 14, 2023.  JA: The notice of appeal was timely filed on May 3, 2023.  JA:

## SUMMARY OF ARGUMENT

Leach presented a vast body of evidence that he was discriminated and retaliated against by multiple unlawful employment actions that individually and collectively ended his career.  Any reasonable jury would have been fully justified in concluding that Leach was an exceptionally capable, fair, and demanding manager, as reflected by nine years of impeccable appraisals and cash awards.  JA: to JA: .  Leach received these superlative ratings and generous awards every single year he was under Bailey and O'Connor's supervision, which is another way of

---

[6]     The Complaint was amended as a matter of right on January 24, 2019.  JA:

saying that Leach was accurately rated Outstanding every single year the Mint alleged he was abusive to subordinates.  JA:

At *no point* did the Mint dispute the accuracy of Leach's nine years of its contemporaneous assessments of Leach's performance.  On the contrary, Bailey admitted that Leach's appraisals were accurate and that anything negative about Leach's performance or conduct in supervising subordinates would have been reflected in them.  JA:

The district court took no notice of this unexplained incongruity even though it was persuasive evidence of pretext.  *See Stoe v. Barr*, 960 F.3d 627, 631, 640-41 (D.C. Cir. 2020).  Leaving aside the remainder of the impressive body of evidence Leach offered, the district court usurped the jury's role in the most fundamental way.  A jury could readily have found that Leach's actual managerial performance was reflected in his appraisals and that the defendant's mischaracterization of Leach many years later was fabricated.  *E.g., Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000).

Any reasonable juror could also conclude that events outside the Medina email led to Leach being investigated by OIG, disciplined, and removed from his position, among other unlawful employment actions.  Bailey and O'Connor gave Leach his final Outstanding rating on October 19, 2016, but *never* identified any incident between then and Medina's email of December 21, 2016, to justify putting

Leach under investigation and disciplining him.  Any legitimate reason for taking action against Leach would have had to have occurred during that brief period because Bailey admitted he was satisfied with Leach's management of Medina and his Division until he received Medina's email.  JA:  Despite this admission, the Mint pointed to the Medina email, Medina's allegations, and Medina himself as the sole reason for Leach being referred to OIG over 50 times in its summary judgment motion.  JA:

The district court usurped the jury's function yet again when it held that Medina's email "set off alarm bells" warranting investigating, disciplining, and eventually removing Leach from his supervisory role.  JA:  The email could not have triggered any action toward Leach because there was nothing new in it.  Medina testified that Bailey did not take the same complaints about Leach seriously and Bailey admitted that he did not believe the Medina email.  JA:

The district court made two significant factual findings that were contrary to undisputed facts.  One that bore heavily on Leach's retaliation claims was the inexplicable error that Leach "cites no record evidence to dispute" that Bailey and O'Connor were unaware of his EEO complaint when they funneled a false and distorted record of Leach's management to OIG.  JA:  Leach most certainly did.  JA:  The official report of the EEO counselor specifically recorded that two days before

23

Bailey spoke with Trimble, she contacted Bailey to get management's response to Leach's complaint.  JA:

The court fundamentally misapprehended another of Leach's principal arguments.  Leach was not claiming that the "decision to launch an administrative investigation" was "discriminatory and retaliatory," which according to the court inherently defeated Leach's claims over being referred to OIG because that happened later.  JA:  It was that a reasonable juror could conclude that Motl, Gentry, and O'Connor made the decision to refer Leach to OIG in their meeting on January 9, 2017, just as Motl testified; that they did so because Leach had an active EEO complaint against Motl and justified doing so on the pretext that Leach was engaged in criminal activity; and that Bailey and O'Connor falsely claimed that Bailey made a decision before that meeting to conduct an AI, which he did not do and was not authorized to do.  JA:

The district court also made significant errors of law.  JA:  It correctly assumed that all of the actions challenged by Leach were actionable as discriminatory under this Court's *en banc* decision in *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022).  But the court erred grievously in holding that *Chambers* did not apply to retaliatory changes in employment.  JA:  The remark in *Chambers* which led the district court to reach that conclusion did not even rise to the level of *dictum*.  35 F.4th at 876-77.

24

These errors led the district court to ignore undisputed and genuinely disputed material evidence that was highly probative of discrimination and retaliation under *Sprint v. Mendelsohn*, 552 U.S. 379, 381 (2008); *Reeves*, 530 U.S. at 150, 151; *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 & n.3 (D.C. Cir. 2008); *Lathram v. Snow, 336 F.3d 1085, 1093-94 (D.C. Cir. 2003);* and *Singletary v. District of Columbia*, 351 F.3d 519, 524-25 (D.C. Cir. 2003).

The district court also failed to recognize that basic principles of proximate cause required it to consider the Mint's actions not only individually but collectively, as well as the significance of Bailey's proposal to suspend Leach and remove Leach from his position. *E.g.*, *Staub v. Proctor Hospital,* 562 U.S. 411, 421-22 (2011). The court's rationale was that Bailey commenced an AI and removed Leach from his position before Leach was referred for investigation by OIG. JA: The undisputed record showed that while the letter referring Leach was sent on January 17, 2017, Motl, Gentry, and O'Connor made the decision to refer Leach to OIG on January 9, 2017 before Bailey took any action. JA:

## <u>STANDARD OF REVIEW</u>

This Court's review is *de novo*. *E.g.*, *Feld v. Fireman's Fund Ins. Co.*, 909 F.3d 1186, 1193 (D.C. Cir. 2018). The Mint could not be awarded summary judgment unless there was "no genuine dispute as to any material fact" *and* it was "entitled to a judgment as a matter of law." *Rule 56(c), FRCP*; *Anderson v. Liberty*

*Lobby*, 477 U.S. 242, 247 (1986).  On summary judgment, a court "must disregard all evidence favorable to the moving party that the jury is not required to believe," in contrast to all the "evidence of the non-movant" which "is to be believed." *Reeves*, 530 U.S. at 150-51.  The record must be "taken as a whole." *Stoe*, 960 F.3d at 638 *(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)).  "Summary judgment must be reversed if, based on the record, inferences contrary to those drawn by the trial court are also plausible." *Feld,* 909 F.3d at 1194 (cleaned up).  Although some "metaphysical doubt as to the material facts" is insufficient, *Matsushita*, 475 U.S. at 587, "divergent inferences" about material facts "requires resolving the parties' differing versions of the truth at trial." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).

## ARGUMENT

### I.    Retaliatory Changes In Terms And Conditions Of Employment Are *Per Se* Actionable

#### A.    *Chambers'* Applies To Retaliatory Employment Actions

*Chambers* played an important but not dispositive role in this case.  *Chambers* partially overruled *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999), holding that discriminatory changes in employment are actionable without regard to whether they cause "objectively tangible harm."  35 F.4th at 874-75 (quoting 42 U.S.C. §2000e-2(a)(1)).  *Chambers* did so by returning the focus in determining that all changes in

26

the "terms" and "conditions" employment actions were actionable as discriminatory under Title VII's express language. *Id.*

A short passage in the *Chambers* majority opinion responded to the full dissent's concern that overruling *Brown* could cause "substantial uncertainty" and that materiality should be an element of all employment-related violations of Title VII, pointing to the definition of retaliatory changes in *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53 (2006). *Compare Chambers, 35 F.4th at 876-77 with id*. at 886-87. The majority instead noted that materially adverse action was unnecessary because *Burlington Northern* extended Title VII's protection against retaliatory acts committed outside of the workplace and employment actions not as severe as adverse employment actions. *Id*. at 876-77. The majority also observed that it did not need to "decide whether Title VII includes a de minimis exception" because the *Chambers* employment action, an involuntary transfer, "easily surmounts this bar." *Id*. at 875-76. The district court erroneously took this exchange as holding that *Chambers* did not apply to retaliatory changes in terms and conditions of employment, declaring "retaliation is out" for many of defendant's retaliatory actions. JA:

**B.**   ***Burlington Northern* Did Not Hold That Different Standards Apply To Discriminatory And Retaliatory Changes In <u>Employment That Are Adverse Employment Actions</u>**

Employment cases frequently contain claims that certain actions are both discriminatory and retaliatory, as this case does.  Just as *Chambers* did not hold that employment actions that are actionable as discriminatory are no longer *per se* actionable as retaliatory, neither did *Burlington Northern*.

The *Burlington Northern* plaintiff alleged that two specific changes in employment, an involuntary transfer and a temporary suspension with backpay, were discriminatory and retaliatory.  *White v. Burlington Northern & Santa Fe Railway Co.*, 2000 WL 35448693, at *1 (W.D. Tenn. Nov. 16, 2000).  The district court upheld the retaliation verdict, concluding that both the transfer and the suspension were adverse employment actions.  *Id.* at *2-3.  The Sixth Circuit's panel decision held that they were not.  *White*, 310 F.3d 443, 451-52 (6th Cir. 2002). The Sixth Circuit reversed *en banc,* even though the revoked suspension was not an ultimate employment decision and the involuntary transfer was between two relatively equal positions.  *White*, 364 F.3d 789, 800-04 (6th Cir. 2004).  The Sixth Circuit specifically held that both actions were "adverse employment actions" and departed from other Circuits which held that retaliation claims had to be "ultimate employment decisions," a higher standard.  *Compare id.* at 800-04 *with e.g., Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997).[7]

---

[7]    Use of the term "adverse employment action" to define changes in employment that are actionable as discriminatory was unaffected in *Chambers*.

The Supreme Court affirmed the Sixth Circuit's *en banc* decision without ever doubting that the involuntary transfer and temporary suspension constituted adverse employment actions.  Rather, the Court addressed "whether Title VII's anti-retaliation provision only" applies to "harms that are related to employment or the workplace," and "how harmful an act of retaliatory discrimination must be in order to fall within the provision's scope." *Burlington Northern*, 548 U.S. at 57.  The Court answered those two questions separately, first by holding that Title VII's "anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harms." *Id.* at 67.  Second, by holding that retaliation is actionable when "a reasonable employee would have found the challenged action materially adverse, 'which in this context means that it might well have disuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (*quoting Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  These answers did not suggest that to be actionable, retaliatory changes in terms and conditions of employment had to be more severe than adverse employment actions as defined in individual Circuits.

## C.    The District Court's Interpretation of *Chambers'* Effect On *Burlington Northern* Produced An Invidious Result[8]

---

[8]    *Chambers* did not change continued use of the term "adverse employment action" to define changes in employment that are actionable as discriminatory. *Id.* at 874-75, 879-82.

Until *Burlington Northern* and *Rochon,* this Circuit was among those holding that both discriminatory and retaliatory changes in employment had to be adverse employment actions to be actionable. *E.g., Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003). If the Supreme Court had never issued *Burlington Northern*, once *Chambers* lowered the standard of adverse employment actions in the context of discrimination, the standard for actionable retaliatory changes would have followed automatically. The district court's misinterpretation of *Chambers* negated the very purpose of *Burlington Northern*, which was to make Title VII's prohibition on retaliation broader than its prohibition on discrimination. 548 U.S. at 65-67.

### D.    Defendant's Attempt To Diminish *Chambers* Was Meritless

Defendant contended that *Chambers'* express holding was circumscribed by *Babb v. Wilkie*, 140 S.Ct. 1168 (2020), although *Babb* preceded *Chambers* by two years and did not concern Title VII. JA: .[9]   The issue in *Babb* was whether the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §633a(a), "imposes liability only when age is a 'but-for cause' of the personnel action in question." *Id.* at 1171. In answering that distinct question, *Babb* pointed to a list of prohibited personnel practices in the Whistleblower Protection Act, 5 U.S.C. § 2302(a)(2)(A) ("WPA"), for the proposition that it broadly includes "*most* employment-related

---

[9]    This argument was not mentioned by the district court.

actions" that under the ADEA, "'shall be made free from any discrimination based on age.'" *Id*. at 1173 (emphasis supplied). *Babb* did not state that "personnel actions" identified in the WPA's list comprised the exclusive universe of adverse employment actions or materially adverse actions covered by Title VII. *Id.*

## II.      The Actions Plaintiff Challenges Are Cognizable After *Chambers* As Discriminatory And Retaliatory Adverse Employment Actions[10]

### A.      Leach Was Subject To Multiple Adverse Employment Actions

The district court considered it "prudent" to assume that all of defendant's actions toward Leach qualified as discriminatory employment actions under *Chambers*."[11]  JA:  It was right to do so and as demonstrated earlier in Section I, *Chambers* made them retaliatory as well.[12]

*Chambers* specifically held that Title VII is "capacious" and that by leaving the phrase "'terms, conditions, or privileges of employment'" undefined, Congress

---

[10]      This Section concerns the legal issue whether Leach's claims are actionable. Sections IV and V concern whether there were disputed issues of material fact about discrimination and retaliation.

[11]      The district court described the actions toward Leach as "adverse actions" rather than "adverse employment actions," the terminology that remains in use after *Chambers*.  35 F.4th at 880-81.  "Adverse actions" are those personnel decisions, such as long suspensions, demotions, and removals, that are appealable to the Merit Systems Protection Board under the Civil Service Reform Act, 5 U.S.C. §7512.

[12]      The Mint did not contest that imposing a two-day suspension on Leach which resulted in his reassignment was actionable.  JA:

31

"'evince[ed] a[n] ... intent to strike at the entire spectrum of disparate treatment ... in employment,'" drawing "no distinction between 'economic' and 'non-economic' discrimination or 'tangible' and 'intangible'" discrimination.   35 F.4th at 874 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).  The only "limiting principle" is that to challenged action must relate to "terms, conditions, or privileges of employment."  *Chambers*, 35 F.4th at 877 (quoting 42 U.S.C. §2000e-2(a)(1)).

Whether a contested action is work-related "is a purely objective inquiry." *Chambers*, 35 F.4th at 877.  There are six employment actions that are at issue in this appeal that can roughly be grouped as follows:  referring Leach for investigation to OIG over Medina's false allegations; idling Leach during that investigation; interfering with OIG's investigation to pre-determine its outcome; and based on OIG's compromised report, proposing to suspend Leach; and suspending Leach, and detailing and reassigning him involuntarily outside of his career field after idling

him for over a year.[13]  All of these actions were undeniably objectively related to Leach's employment and are actionable under *Chambers*.[14]

**B.     Even Individually, Defendant's Actions Are Actionable Under *Burlington Northern***

Under *Burlington Northern*, even when changes in the terms and conditions of employment do not reach the level of adverse employment actions, retaliation is actionable when it amounts to a materially adverse action if it might "'dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68 (*quoting Rochon,* 438 F.3d at 1219).  Defendant's actions toward Leach fit this definition.  Any "doubt" on this score "is generally a jury question." *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007).

Among his other duties, Leach was in charge of protecting Mint facilities, IT resources, assets, personnel, and visitors; conducting background investigations of employees and potential employees; and supervising two branches with 13 white

---

[13]     Leach is not appealing the award of summary judgment on his hostile work environment claim or the recission of telework, because that flowed as a result of being suspended.  Leach is also not appealing his non-selection for the position created while he was indefinitely reassigned out of his position because too much time has passed.  Making it impossible for Leach to return to his former position because it no longer had a full complement of duties remains relevant.

[14]     Although the judges in *Chambers* who joined the majority opinion and the judge who authored an opinion that concurred in the judgment debated whether Title VII contained an exception for de minimis employment actions, 35 F.4th at 875, 883-86, there was nothing de minimis about defendant's actions toward Leach.  JA:

collar employees.  JA:  Leach was responsible for providing "critical input" in establishing ten-year business plans for Protection and the Mint and served as its Subject Matter Expert on Homeland Security's program of enhancing security throughout the federal workforce.  JA:  These vital responsibilities were removed from Leach and he was given very little to do in their place, to the point that he spent much of his time watching CNN.  JA:

Severely diminishing an employee's duties and responsibilities has been actionable under Title VII for 25 years. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Unrelated to this legal issue, the district court held that Leach's referral to OIG was not actionable on one purely factual ground: its erroneous conclusion that Bailey placed Leach under investigation and relieved Leach of his duties on January 9, 2017, before Leach was referred to OIG on January 17, 2017.  JA:  January 17, 2017 was nothing more than the date that O'Connor sent a referral letter to OIG.  JA:  The decision to refer Leach to OIG was made by Motl, O'Connor, and Gentry on January 9, 2017. By Bailey's admission, he did not relieve Leach of his duties until after conferring with Gentry, *i.e.,* later that day and did nothing before then; and under Mint written policies, Bailey could not have done anything on his own.  JA:

Returning to the legal issue, neither the district court nor the parties were aware of a decision of this Court holding that Inspector General investigations of

34

managers whose responsibilities encompass agency-wide security are not materially adverse actions. JA: The district court surveyed several decisions by other district judges and concluded that by themselves, referrals to inspectors general are typically not actionable. *Id*. But Leach suffered harm beyond the referral itself which *is* actionable. *Clark v. Johnson*, 206 F.Supp.3d 645 (D.D.C. 2016) (concluding that placing an employee on a 120-day detail with diminished responsibilities before her security clearance investigation was completed supported a claim of retaliation even under the pre-*Chambers* "objectively tangible harm" standard). *Id*. at 654, 661.[15] Twenty years before *Chambers*, this court held that withdrawing supervisory duties and failing to replace them with equivalent responsibilities "constitute[d] an adverse employment action." *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003); *Burke v. Gould,* 286 F.3d 513, 522 (D.C. Cir. 2002). Fifteen years before *Chambers*, this Court held that being referred for an investigation that automatically resulted in another adverse employment action was actionable as retaliatory. *Velikonja v. Gonzales*, 466 F.3d 122, 123-34 (D.C. Cir. 2006).

Moreover, proposed disciplinary actions are cognizable under *Burlington Northern*, contrary to the district court's decision. JA: "Proposed removals" that result in the imposition of disciplinary action "are exactly the kind of acts which"

---

[15] Other decisions were issued before *Chambers* required objectively tangible harm. *E.g.*, *Jones v. Castro,* 168 F.Supp.3d 169, 180 (D.D.C. 2016); *Ware v. Billington*, 344 F.Supp.2d 63, 72-75 (D.D.C. 2004).

Title VII "covers" as materially adverse actions. *Holmes-Martin v. Leavitt,* 569 F.Supp.2d 184, 203 (D.D.C. 2008). They are not actionable when disciplinary action is not imposed. *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008).

The Mint did not dispute that suspending Leach, which resulted in his involuntary reassignment, was actionable. JA: As before, the district court based summary judgment on the disputed factual ground that O'Connor scrutinized the record independent of the tainted OIG report, even though O'Connor had no real idea what Medina's alleged complaints were and knew full well that Leach's performance appraisals demonstrated that Leach's management of his division was admirable. JA:

The district court made one legal conclusion showing it fundamentally misapprehended the case; namely, that Leach had no basis to claim discrimination because he and Bailey are both Black. JA: Leach's claim was that Bailey was working with, lying for, and taking explicit and implicit direction from more senior Caucasian officials whom he knew firsthand were taking pretextual punitive actions against Dickerson and Leach. JA. That was more than enough to "tweak" the typical *McDonnell Douglas* method of inferring discrimination. *Mastro v. PEPCO*, 447 F.3d 843, 852 (D.C. Cir. 2006); *Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993).

### III.    **The District Court Improperly Disaggregated Defendant's Actions**

Proximate cause as defined in tort law is the standard of causation in employment cases. *Staub*, 562 U.S. at 419-22 (using the words "tort" and "proximate cause" over ten times). That standard "requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that [are] too remote, purely contingent or indirect.'" *Id.* (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010)). The Supreme Court has addressed causation in employment cases many times, the most recent of which is *Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731 (2020). There, the Court held that but-for causation in employment law is "a sweeping standard. Often, events have multiple but-for causes," *id.* at 1739, consistent with *Staub's* holding that challenged employment actions frequently "have multiple proximate causes," *Staub*, 562 U.S. at 420. Defendant is therefore liable for everything set in motion by Motl, Gentry, and O'Connor because their actions were taken with impermissible intent and "intended to cause, and did in fact cause," adverse employment" actions to be taken against Leach. *Staub*, 562 U.S. at 421.

At every key juncture, Bailey misstated material facts. As demonstrated earlier (at 12-17), Bailey incontrovertibly mislead the EEO investigator having placed Leach under AI and removing Leach's duties before Motl, Gentry, and O'Connor met, and misled the investigator about his authority to do so. JA:

37

As was also discussed earlier (at 12-14), the EEO counselor's report documents that she spoke with Bailey before he was interviewed by Trimble and demonstrates that Bailey fabricated having "had no knowledge" of Leach's EEO complaint before his interview by OIG.  *Compare* JA: *with* JA:

Bailey did the same again when he falsely told a second EEO counselor that "the IG proposed that Mr. Leach be suspended and they (Management) followed through based on what was proposed."  JA:   OIG made no such recommendation. JA:

With these fabrications, Bailey was trying to divert attention from the fact that Motl, Gentry, and O'Connor were responsible for Leach being investigated by OIG; and that he and O'Connor had reason to misrepresent Leach's performance over many years. Bailey also sought to make it appear that he was innocently following OIG's recommendation when he proposed to suspend Leach as was O'Connor when he suspended Leach.  From beginning to end, the connection between the decision to refer Leach to OIG and all of the actions taken against Leach that followed was never broken.  Therefore, defendant is liable for all of them.  *Staub*, 562 U.S. at 421.

### IV.    The Record Is Replete With Evidence Of Discrimination and Retaliation

Summary judgment in employment cases is no longer a complex analytical battleground.  *Brady,* 520 F.3d at 494.  Once an employee demonstrates that they

"suffered an adverse employment action" or a retaliatory materially adverse action[16] and an employer has asserted a legitimate, reason for its actions, a "court must resolve one central question." *Id.* Could "a reasonable juror" find in the employee's favor. *Aka v. Washington Hospital Ctr.,* 156 F.3d 1284, 1297 (D.C. Cir. 1998) *(en banc).*

*Brady* catalogued many types of circumstantial evidence from which inferences of prohibited animus can be drawn, 520 F.3d at 495 & n.3, including lack of credibility and deception, *see Reeves*, 530 U.S. at 150, 151, and *Aka,* 156 F.3d at 1297; comparable treatment of "me too" witnesses, *see Sprint*, 552 U.S. at 381; violation of established policies, *see Lathram,* 336 F.3d at 1093-94*;* and "the employer's general treatment of minority employees," *see Brady*, 520 F.3d at 495, & n.3 (citations omitted).[17]

An inference of retaliation can be drawn from this same evidence. *Lathram*, 336 F.3d at 1094. Retaliation may also but need not be proven by close temporal proximity between materially adverse action and active phases of protected EEO activity. *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001); *Singletary*, 351 F.3d at 524-25; *Beard v. Preston*, 576 F.Supp.2d 93, 105 (D.D.C.

---

[16]    The *Brady* formulation also applies to retaliation. *McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012).

[17]    This Court has expressly held that requiring comparator evidence "is not a correct statement of the law." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005).

2008) ("no case law" supports the notion "that a temporal gap alone would *require* a grant of summary judgment") (emphasis in original) (*accord*, *e.g., Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir. 1997) ("[I]t is causation, not temporal proximity itself, that is an element of" retaliation.").  The record is brimming with these very types of evidence, much of which the district court ignored.

### A.    <u>The District Court Improperly Resolved Credibility Issues</u>

A powerful legal principle that applies to cases of all natures holds that on summary judgment:

> [A] court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.
>
> 'Credibility determinations [like] the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

*Reeves,* 530 U.S. at 150-51 (quoting *Liberty Lobby*, 477 U.S. at 255 (other citations omitted).  Exposing an employer's concealment of the real reasons for its actions is compelling "evidence of consciousness of guilt" and allows discrimination and retaliation to be inferred "more readily."   *Aka*, 156 F.3d at 1293, 1295; *accord Reeves,* 530 U.S. at 147.

### B.    <u>The Mint Never Explained Its Caricature Of Leach's Management</u>

40

One central issue was how O'Connor and Bailey reconciled Leach's nine years of flawless performance appraisals and many awards with their referral to and interviews by OIG that Leach had been abusive toward subordinates since day one. JA: They never tried, not even in their suspension decisions. Bailey admitted not only that Leach's performance reviews were accurate, but also that any unsatisfactory supervision or management on Leach's part "would have [been] reflected in his performance appraisal[s]" for as "long as" Bailey "supervised him." JA: This core issue that Leach's appraisals were accurate and that Bailey and O'Connor's accounts were revisionist is indisputable.

### C.    <u>Bailey and O'Connor Were Deceitful</u>

### 1.    <u>O'Connor Was Not Credible</u>

The Mint tried to conceal the truth about how and when Leach came to be referred to OIG. Bailey's EEO Affidavit let slip that the decision to refer Leach to OIG for investigation was conceived in a meeting between Motl, Gentry, and O'Connor. JA: The full account came out after intensive litigation over the Mint's invocation of the attorney-client privilege. JA: (adopted by Minute Order of November 9, 2021).

Motl testified at his deposition that the meeting was convened because O'Connor brought an "EEO concern" to his attention earlier that day; that at the meeting, Gentry stated that EEO complaints had to be referred for investigation to

OIG; that *O'Connor advised Motl and Gentry that the Medina email contained allegations of criminal conduct by Leach*; and that Gentry and Motl stated that the administration of then-private citizen Donald Trump needed to be alerted.  JA:  .[18]

O'Connor swore in his EEO Affidavit that he referred Leach to OIG after he "briefed" Motl and Gentry.  JA:  When questioned at his deposition about this "briefing," O'Connor's account differed markedly from Motl's and Bailey's; O'Connor testified that he was never at a meeting with Motl and Gentry, and that the decision to refer Leach to OIG was his alone.  JA:

On summary judgment, it could not be disputed that O'Connor was an active participant in the meeting with Motl and Gentry where the three decided to refer Leach to OIG; that the meeting was called after O'Connor reported an "EEO concern" to Motl; that the "EEO concern" could only have referred to Leach's EEO complaint against Motl; and that O'Connor falsely stated that there were allegations of criminal conduct to justify referring Leach to OIG.  JA:  The inference the district court was required to draw on summary judgment was that O'Connor's account of having come up with referring Leach to OIG by himself was false and designed to cover up involvement of Mint executives Gentry and Motl, one of whom (Motl) was

---

[18]    Bailey also placed O'Connor at the meeting with Gentry and Motl.  JA:

O'Connor's boss.  That by itself warranted denying summary judgment.  *Aka,* 156 F.3d at 1290 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)).

In a new declaration accompanying defendant's motion, O'Connor improperly declared that he does "not recall" whether Motl or Gentry had "an opinion one way or another" whether Leach should be "referred to the OIG."  JA:  O'Connor was specifically asked at his deposition whose idea it was to refer Leach to OIG and testified that he made the decision alone.  JA:   O'Connor was also cautioned that his "deposition was not a take-home examination," and that he would be "give[n] the opportunity to "break in and say whatever" he "need[ed] to say to make [his] answer complete, which he was.  JA:  O'Connor's new declaration proves nothing, except that he is being deceitful again.  *Cleveland v. Policy Management Systems, Corp.,* 526 U.S. 795, 806 (1999).

### 2.    Bailey Was Also Not Believable

On January 30, 2017, the EEO counselor in Leach's complaint naming Bailey and O'Connor spoke with Bailey to get his account of how Leach came to be investigated by OIG.  JA:  Bailey said something directly contradictory in his summary judgment declaration that defendant claimed proved Bailey "could not have been motivated by retaliatory animus."  JA:

> I was interviewed by the OIG investigator on ***February 1, 2017***.  At that time, I had no knowledge that Mr. Leach commenced the equal employment opportunity complaint process on January 11, 2017.

43

JA: (emphasis supplied).  The Mint never denied that Bailey was contacted by the EEO counselor two days before being interviewed by OIG.  Rather, it contended that the report was hearsay.  JA:

EEOC regulations governing activities in the counseling stage specifically provide that counseling will be conducted and documented in written reports prepared in accordance with Commission Management Directives.  29 C.F.R. §1614.105(c).  Chapter 2.D. of Management Directive 110 spells out counselors' duties, which include "[s]eeking a resolution of the dispute at the lowest possible level" and giving "the agency an opportunity to present its position" to the counselor. *Id*. at 2-6, 14, App. B-5, b.  The report of the EEO counselor assigned to Leach's complaint proving that she contacted Bailey on January 30, 2017, is not hearsay under Federal Rules of Evidence 803(6), (8).  *E.g., Itel Capitol Corp. v. Cups Coal, Inc.,* 707 F.2d 1253, 1260 (11th Cir. 1983).  Any response by Bailey would be admissible under FRE 801(d)(2)(D), because Bailey's statements would have been within the scope of his authority and contrary to defendant's interests. *E.g., Fischer v. Forestwood Co., Inc.,* 525 F.3d 972, 984 (10th Cir. 2008); *Simple v. Walgreen Co.,* 511 F.3d 668, 672 (7th Cir. 2007); *Koninklijke Luchtvaart Maatschappij N.V. KLM Royal Dutch Airlines Holland v. Tuller*, 292 F.2d 775, 784 (D.C. Cir. 1961).  A declaration from the counselor or other EEO official is not necessary for the report to be admissible even at trial.  *E.g., Itel,* 707 F.2d at 1260 (citations omitted).  Even

if it was, under FRCP 56(c)(1)(B), defendant's hearsay objection on summary judgment would be ineffectual, because defendant is unable to demonstrate that the report "cannot be presented in a form that would be admissible in evidence" at trial by subpoenaing the counselor or an agency EEO official. *See also Kyriakopoulos v. George Washington University,* 866 F.2d 438, 446 (D.C. Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); 2010 Advisory Committee Notes (discussing Rule as previously numbered 56(c)). O'Connor's new declaration proves nothing, except that he was deceitful again.

### D. The District Court Reached Erroneous Conclusions Based On Other Impermissible Assessments Of Credibility

Although the imperative for a court to avoid making credibility determinations on summary judgment is clear, the district court impermissibly credited other statements made by Bailey which heavily influenced its award of summary judgment.

#### 1. Bailey Admitted He Did Not Believe Medina

Once reminded about his years of Outstanding performance appraisals of Leach, Bailey admitted under oath that from the time he received the Medina email to when the decision was made to refer Leach to OIG, he did not believe Medina's allegations were true. JA:

> Q: So, is it fair to say that as of December 21, 2016, or thereabouts, that you believed that Mr. Medina's allegations against Mr. Leach were true?

45

A:    No.

Q:    At the time that you took Mr. Leach out of his position of supervision over the Security Division did you believe that Mr. Medina's allegations were correct?

A:    No.

Q:    Could you give me the answer again, Mr. Bailey?

A.    No.

JA:  As can be seen, Bailey was given the opportunity to re-think his answer about whether he believed Medina when he took Leach out of his position, which coincides with when Motl, Gentry, and O'Connor decided to refer Leach to OIG, and still said "No."

### 2.    <u>The District Court Impermissibly Distorted Bailey's Admissions</u>

Any reasonable juror could conclude that Bailey admitted that he did not believe Medina's allegations.  That conclusion would be reinforced by Bailey's other admissions that before and after receiving Medina's email, Leach's perfect FY 2016 appraisal in October of 2016 accurately reflected his assessment of Leach for years; and that up until the moment he received Medina's email, Bailey was satisfied with "Leach's supervision," "teamwork within his division," and "enhancing diversity." JA:

Nonetheless, in uncharacteristic (and undeserved) language, the district court held that by speaking out of both sides of his mouth, Bailey meant that "he had not

46

prejudged" Medina's allegations "or formed an opinion on their veracity before the investigation." JA:   At trial, reasonable jurors could readily believe that Bailey, an adverse witness, made damaging admissions that were corroborated in his deposition and in his own writings elsewhere. *Stoe*, 960 F.3d at 631, 640-41. In concluding that Leach offered no evidence that Bailey provided false or withheld relevant evidence from OIG was contrary to Bailey's admission, Trimble's testimony, the OIG report, and Bailey's credibility, JA: , the district court improperly assumed the jury's role. *E.g., Reeves*, 530 U.S. at 150-51.

### a.    Bailey Was Not Waiting On OIG

Bailey's EEO Affidavit stated that:  "The Chief Counsel recommended I refer the email" Medina sent to him and O'Connor to OIG "which I did" and once "I referred the email to the OIG," it opened an investigation "into the allegations raised by Medina."  JA:  The referral was not just about Medina's email much less the hallmark of someone open-minded.  It stated:  *"I have found what appears to be [Leach's] pervasive abuse of authority in his handling of subordinate employees."* JA:  (emphasis supplied).  This assessment of Leach obviously meant that neither Bailey nor O'Connor were awaiting the outcome of OIG's investigation without pre-judging Leach.  JA:  In fact, in the 18 months Medina worked for Leach, Bailey heard Medina grousing before about Leach and ignored him.  JA:

### b.    The Court's Assessment of Bailey Disproved His Open-Mindedness

Far from proving that Bailey was open-minded, the Court's assessment of Bailey disproved that Bailey was neutral and dispassionate.  Bailey volunteered to Trimble "Leach rides Medina," "is intimidated by Medina," "told Medina he should take employment with Medina's family outside of" the Mint, and "removed" Leach from a project and "replaced" him with Medina.  JA:

Trimble was "sure" Bailey "would have reflected … Leach's supposed trouble communicating with subordinates … in his performance appraisal[s]."  JA: But Bailey withheld Leach's unblemished appraisals from Trimble and everything else that reflected positively on Leach.  JA:   The district court credited Bailey's superficial excuse that he only gave Trimble negative information and documents concerning Leach because "[h]e did not ask me."  JA:   But when asked how Trimble would know to request positive information about Leach, Bailey admitted he had no idea.  JA:  Any reasonable juror's lingering reservations about Bailey's neutrality and intent would have evaporated.

    **c.**    **<u>Bailey Also Fabricated About How Leach Came To Be Suspended</u>**

Bailey told a second EEO counselor that "the IG proposed that Mr. Leach be suspended and they (Management) followed through based on what was proposed." JA:   OIG made no such recommendation.  JA:

    **V.**    **<u>The Record Is Brimming With Evidence Of Discrimination And Retaliation In Addition To Defendant's Lack Of Credibility</u>**

48

Although a jury is entitled to infer discrimination and retaliation just from an employer's lack of credibility and its deception, *Reeves*, 530 U.S. at 150, 151; *Aka,* 156 F.3d at 1297, Leach offered a large volume of other types of circumstantial evidence that *Brady* recognized as probative. The district court considered none of it.

### A.    Motl's Treatment of Dickerson And The Cooperation of Bailey and O'Connor Is Highly Probative

Evidence that Motl discriminated against Dickerson and then retaliated against her is highly revealing regardless of whether Dickerson is "similarly situated" to Leach. *Sprint,* 552 U.S. at 381, 386.[19]  It also shows that Bailey and O'Connor were both  complicit in Motl's discrimination and retaliation toward Leach from their experience with Dickerson. Their interaction virtually mirrored their treatment of Leach and occurred contemporaneously . JA:

Bailey and O'Connor learned three lessons from the Dickerson experience. One is that African American managers, and particularly those who file EEO complaints against Motl, get formally investigated  when subordinates complain about their leadership. JA:

---

[19]    "[U]se of the phrase 'similarly situated'" arises "in the entirely different context of a plaintiff's allegation that nonminority employees were treated more favorably than minority employees." *Sprint*, 552 U.S. at 386.

A second lesson is that even if an African American manager who has filed an EEO complaint is cleared, O'Connor and Bailey are not to return them to previous or supervisory positions.  JA:

The third lesson O'Connor and Bailey learned was they were to conceal Motl's involvement.  O'Connor's Affidavit in the investigation of Leach's EEO complaint stated:  "Field Chief Dickerson was relieved of her duties pending the outcome of an administrative investigation and returned to duty upon completion of the investigation."  JA:  Bailey's Affidavit stated:  "Once the AI was over and resolved [Dickerson] was placed back into her position as Field Chief, D.C. Field Unit."  JA:  Both knew that Dickerson was not returned to her former position.  JA:  She was involuntarily reassigned to a non-supervisory position created just for her.  *Id.*

## B.    There Is Direct Evidence Defendant Retaliated Against Leach

Direct evidence of discrimination or retaliation occupies a special place in employment litigation.    "[W]hen the plaintiff offers direct evidence of discriminatory [or retaliatory] intent, that evidence will generally entitle a plaintiff to a jury trial."  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 574 (D.C. Cir. 2013).  Gentry stated at the meeting with O'Connor that O'Connor was to refer Leach to OIG because he filed an EEO complaint that had the potential to implicate senior officials of the Mint.  JA:

50

### C.    Defendant's Top Executives Are Antagonistic To African Americans Who Participate In Protected EEO Activities

Gentry and Motl were two very senior executives at the Mint, its Chief Counsel and Chief Administrator/Acting Deputy Director, respectively.  Both were exceptionally antagonistic toward  African Americans engaging in EEO activities.  Gentry had former HR official AB placed under investigation for providing an Affidavit in an EEO investigation adverse to Motl and testifying about Motl's attempts to retaliate against the successful *Craig* plaintiff.  JA: *Craig*, Civ. Action No. 14-1340, ECF #99; JA:

### D.    The Mint Violated Written Personnel Policies

Earlier, Section II demonstrated that while Leach was only "temporarily" out of his position pending OIG's report, Motl and O'Connor made sure he could never return.  They created a new position that could barely support a GS-15 grade despite incorporating many of Leach's most important duties.  JA: Once the position was established, O'Connor filled it in violation of Mint and Treasury Department written hiring freeze policies.  JA: .  The district court's conclusion that Motl and O'Connor's creation of a position in violation of Mint and Treasury policies by taking away duties that were previously Leach's did not matter, JA: , was erroneous as a matter of law.  *E.g.*, *Lathram*, 336 F.3d at 1092-93.

### E.    There Is Substantial Evidence Of Temporal Proximity

Retaliation can also be proven by the same evidence that proves discrimination. *Lathram,* 336 F.3d at 1094. It may also be proven, but need not be proven, by close temporal proximity between protected EEO activity and materially adverse action. *Clark County*, 532 U.S. at 273; *Beard,* 576 F.Supp.2d at 105 (citing *Kachmar*, 109 F.3d at 178). Temporal proximity is measured from whenever an EEO complaint is active to an employer's next opportunity to retaliate. *Singletary*, 351 F.3d at 524-25; *Pardo-Kronemann v. Jackson*, 541 F.Supp.2d 210, 218 (D.D.C. 2008*), aff'd in part, rev'd in part on other grounds*, 601 F.3d 599 (D.C. Cir. 2010); *Kalinoski v. Gutierrez,* 435 F.Supp.2d 55, 69-70 (D.D.C. 2006).

Motl learned on October 24, 2016, that Leach was still pursuing an EEO complaint against him over being denied training and executed an affidavit on November 9, 2016. JA: On December 19, 2016, Motl sent a Mint-wide email announcing that he just chose his protégé McNally to be acting CFO. Because Leach had identified McNally as a comparator in his complaint, he forwarded Motl's email to his EEO coordinator. JA: On January 9, 2017, O'Connor alerted Motl to an "EEO concern," *i.e.,* Leach's complaint against Motl, which prompted Motl, Gentry, and O'Connor to meet and decide to refer Leach for investigation using Medina's email as a pretext. JA: Motl, as Acting Deputy Director and O'Connor's supervisor, was many levels up from Leach in Mint hierarchy and Motl had no reason to interact with Leach until O'Connor told him about the pending "EEO concern." JA:

## VI.    A Reasonable Juror Could Conclude That Defendant Discriminated And Retaliated Against Leach

The earlier sections of this Brief have explained in detail why a reasonable juror could conclude that Mint's explanations for each adverse employment action toward Leach was a pretext .  It includes, among other matters, undeniable evidence not only of lack of credibility but also deception; the virtual identity of the concurrent discrimination and retaliation toward Dickerson; direct evidence of the connection between Leach's EEO complaint against Motl and his referral to OIG; violation of Mint written policies; and temporal proximity.  Those reasons are incorporated but need not be repeated here.  Rather, the Brief concludes by offering a broader view of what happened to Leach.

### A.    There Was No Decision To Open An Administrative Investigation

A reasonable juror could easily conclude that the meeting between Motl, Gentry, and O'Connor was convened to consider investigating Leach, and that it was triggered by O'Connor reporting to Motl that there was an "EEO concern."  JA: Bailey could not have made that decision because he was not an "appointing official" and that is why there is no written authorization to conduct an AI, both required by Mint policy, i*d*., only the letter referring Leach to OIG.  *Id.; JA:*

Nothing occurred between Leach's receipt of his final perfect Outstanding rating on October 19, 2016, and the Medina email of December 21, 2016, to warrant referring Leach to an Inspector General's office.  Bailey confirmed the alleged

53

incidents previously reported by Medina were meaningless by admitting he was satisfied with Leach's management of Medina and his Division until he received Medina's email.  JA:  The only new event described in Medina's email was a phone call in which Leach "sounded a bit irritated" and called Medina out for trying to make him "look bad."  JA:   No one gets referred to an IG's office for being caustic with a subordinate, and an incident this trivial provides no reason for a top executive of a federal agency to call a meeting with its Chief Counsel with a subordinate in tow.  JA:   O'Connor knew this and with nothing from Medina to go on, O'Connor said there were criminal allegations against Leach and sent an inflammatory, untrue referral letter.  JA:

> **B.**     **There Was No Need To Idle, Detail, And**
>          **Reassign Leach Permanently And Involuntarily.**

The Mint's claim that it only wanted Leach out of a supervisory job is another pretext.  O'Connor and Motl created and filled a new GS-15 position carved out from Leach's job just months after Leach was "temporarily" relieved of supervisory duties and given no real work.  JA:  But the position did not support a GS-15 classification permanently.  JA:   Leach's supervisory duties could have been transferred to the new position pending the outcome of the OIG investigation and he could have continued to perform essential nonsupervisory duties instead of leaving him with little to do.  JA:  That would have made perfect sense, because Leach just received his ninth straight top rating for technical competency.

### C.    **Bailey And O'Connor Were Not Honest Brokers**

Bailey admitted that he relied on the OIG report uncritically, which meant that he was not considering Leach's record independently.  JA: Bailey told a second EEO counselor that "the IG proposed that Mr. Leach be suspended and they (Management) followed through based on what was proposed."  JA:  OIG's report contained no recommendation about how Leach should be treated.  JA:  If Bailey was truly open-minded as the district court erroneously found, he would have admitted learning about Leach's EEO complaint just before being interviewed by OIG and telling Trimble "Leach rides Medina."  He would not have told Trimble he removed Leach because McGinn complained; that ███ won an EEO case against Leach; that Leach's relationship with Graddy deteriorated when Bailey directed Leach to take performance action; or that Meyerhoff left because Leach was abusive when Meyerhoff left to do real police work.  JA:

A reasonable juror could easily find that OIG's report would have been favorable if Bailey had been honest.  The district court's conclusion that Leach's contradiction of Bailey's account of alleged complaints against him did not matter, but only that complaints existed, JA: , was a plain error of law.  *Aka*, 156 F.3d at 1292 ("showing the employer's explanation to be false . . . does have considerable evidentiary significance").

O'Connor was not neutral from the outset. O'Connor's referral letter would not have stated that he believed Leach was engaged in "pervasive abuse of authority," when he really believed that Leach's appraisals were accurate, had little if any idea what Medina's complaint was about, and would not have accused Leach of pilfering travel funds. JA:  And O'Connor's and Bailey's willingness to capitulate to Motl and remove Dickerson from her position permanently and then misrepresenting to the EEO investigator that she was "returned to duty" provides further evidence of their dishonesty.  JA:

## CONCLUSION

For the foregoing reasons, appellant Lester Leach respectfully requests that the Court reverse the decision below and remand this case for trial.


Respectfully submitted,



*//s//* Robert C. Seldon, Esq.
Robert C. Seldon, Esq.
Angela St. Pierre, Esq.
Seldon Bofinger & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C. 20004
(202) 393-8200

Counsel for Appellant

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,693 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Respectfully submitted,

*//s//* Robert C. Seldon, Esq.
Robert C. Seldon, Esq.
Angela St. Pierre, Esq.
Seldon Bofinger & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C. 20004
(202) 393-8200

Counsel for Appellant

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 2nd day of October, 2023, I served a copy of the foregoing Appellate Brief electronically through the Court's ECF system and via first-class mail to:

AUSA Jeremy Simon
Office of the U.S. Attorney for the
District of Columbia
501 3rd Street, NW
4th Floor
Washington, D.C. 20530
Jeremy.Simon@usdoj.gov



_____/s/_____
Robert C. Seldon, Esq.